**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CHRISTINA M. JONES,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:23 C 50441** |
| ) | |
| ) | **Judge Rebecca R. Pallmeyer** |
| **McHENRY COUNTY,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christina Jones ("Plaintiff") brings this lawsuit under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq ("ADA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e – 2000e17 (as amended) ("Title VII") against her employer, McHenry County ("Defendant"). Jones, who worked as a correctional officer until she was placed on leave, alleges that Defendant discriminated against her on the bases of sex and disability, created a hostile environment, and retaliated against her when she made complaints. (Am. Compl. [16], 4.)[1] Defendant has moved to dismiss the Amended Complaint for failure to state a claim under Rule of Civil Procedure 12(b)(6). (Defs.' Mot. to Dismiss [18], 1.) For reasons explained here, the Defendant's motion is granted in part and denied in part.

**BACKGROUND**

On December 15, 2019, while working as a correctional officer for Defendant McHenry County, Plaintiff Christina Jones was tackled and injured by an inmate. (Am. Compl. [16] ¶ 1.) Plaintiff suffered spinal injuries in this assault (*id*. ¶ 5), resulting in years of severe back pain (*id*. ¶¶ 19, 38, 78, 83). A January 2020 MRI showed Plaintiff had a bulging disc and an "annular

---

[1] In filing her Complaint, Plaintiff used the Complaint of Employment Discrimination form provided by the Northern District of Illinois, supplementing the form with additional allegations in numbered paragraphs attached at the end of the form. When citing to the Amended Complaint, the court will use pages (*i.e.* Am. Compl. at 3) to refer to pages of the form complaint, and paragraphs (*i.e.* Am. Compl. ¶ 45) to refer to allegations attached to the form.

tear." (*Id.* ¶ 5.) In the years following the December 2019 incident, she alleges, Defendant discriminated against her by impeding her efforts to obtain necessary medical treatments (*id.* ¶ 166) and retaliated against her for initiating internal complaints and federal investigations (*id.* ¶ 169). Plaintiff's lengthy Amended Complaint presents an exhaustive account of her medical history and her conflicts with Defendant. The court here summarizes the facts most relevant to her claims under Title VII and the ADA.

Immediately following the December 15 incident, Plaintiff was placed on work restrictions pending medical treatment and diagnosis. (*Id.* ¶¶ 1-3.) When she notified her supervisor, Sergeant Guzman, of these restrictions, she alleges, Guzman responded by saying, "I saw that fight, there's no way you got injured doing that," and suggested that Plaintiff was in fact injured by when she "did some crazy sex shit with [her] husband and [is] trying to get the County to pay for it." (Am. Compl. ¶ 4; *see also* Pl's Opp'n [22], 2 (explaining that Sergeant Guzman was Plaintiff's supervisor).) A few months after Guzman made this statement, during an April 2020 appointment with a County-appointed doctor—Dr. Holly Carobene—Dr. Carobene reported to Plaintiff that she [the doctor] was being "pressured to return Plaintiff to work in a light duty position," and also discussed the need for Plaintiff to have surgery. (Am. Compl. ¶ 7.) On May 4, 2020, Dr. Carobene reiterated to Plaintiff that "I can't keep you off work much longer. They are really pressuring me but you are not ready." (*Id.* ¶ 8.) Around this same time, Plaintiff began seeing a doctor at the Orthopedic Spine Institute, Dr. Vivek Mohan, who also recommended surgery and concluded that Plaintiff's injuries restricted her from returning to work. (*Id.* ¶ 11.)

In June 2020, Defendant required Plaintiff to obtain an Independent Medical Review ("IME"), with Dr. Weiss (Plaintiff does not provide his first name or specialty) who was "very rude" to Plaintiff and refused to review her prior MRIs. (*Id.* ¶ 12.) Later that month, Plaintiff learned from Defendant's Risk Management office ("RM") that she could no longer continue seeing her

2

physical therapist, and RM discontinued all of Plaintiff's physical therapy treatments.[2]  (*Id.* ¶¶ 13-15.)  During an appointment with Dr. Mohan on June 6, 2020, Plaintiff learned that the IME had concluded that there was nothing wrong with her and cleared her for "full and active duty."  (*Id.* ¶ 16.)  Contrary to Dr. Mohan's recommendation of continued physical therapy and direction that she not return to work, Defendant ordered Plaintiff to return to "light duty" work on July 1, 2020. (*Id.* ¶ 17-20.)

Plaintiff did attempt to return to work, though back pain made it difficult for her even to drive.  (*Id.* ¶ 19.)  Between July 1 and July 4, Plaintiff was sent home by "Sergeant Males" (presumably, her supervisor, though Plaintiff does not explain) before noon on three out of her first four days because she needed to take prescribed medications to manage the pain.  (*See id.* ¶¶ 20-23.)  On July 3, the one day out of four that she stayed on the job all day, Plaintiff "was in so much pain that she cried continuously throughout her shift and after."  (*Id.* ¶ 23.)  Plaintiff does not explain what her work upon returning to Corrections consisted of and, although she at times referred to "work restrictions" (rather than an outright prohibition on working) (*id.* ¶¶ 20, 22), she has not explained specifically how the "light work" assignment was inconsistent with Dr. Mohan's recommendations.  For the days when Plaintiff was sent home, Defendant "docked Plaintiff's holiday pay."  (*Id.* ¶ 24.)[3]

At the end of July 2020, Plaintiff underwent another IME at Defendant's direction.  This

---

[2]    The Amended Complaint contains various references to Defendant's Risk Management office, along with allegations that Defendant "discontinued all physical therapy" (*see* Am. Compl. ¶ 15) and "denied Plaintiff's doctor's requests for surgery and physical therapy." (*see id.* ¶ 33.)  Indeed, Plaintiff has alleged that "the discriminatory and retaliatory actions originated in Human Resources Department, [precipitated] by Risk Manager Lisa Shamhart." (Pl.'s *Muldrow* Resp. [30], 4.)  Neither side here has explained what role "Risk Management" plays with respect to medical care, nor does the court understand what it means for Defendant to have "discontinued" or "denied" Plaintiff's medical care.  An employer has no power to preclude a worker from seeing a physician or therapist.  The court presumes that Plaintiff was required by the Workers Compensation Act, 805 ILCS 305, to pay for medical care for her injuries and that Defendant refused—perhaps through the Risk Management office—to do so.

[3]    The court presumes that Plaintiff means she did not earn the holiday pay to which she would have been entitled for work on July 4.

time, she alleges, Dr. Weiss concluded that she did not need physical therapy, was capable of full duty work, and "the pain she was experiencing was psychological." (*Id*. ¶ 30.)  Less than a week later, on August 5, 2020, Plaintiff again saw Dr. Mohan, who again recommended that Plaintiff needed surgery and physical therapy, and continued to restrict her from returning to work. (*Id*. ¶ 31.)  On September 8, 2020, Plaintiff initiated psychological therapy.  (*Id*. ¶ 32.)  Despite all this, Defendant "continu[ed] to deny Plaintiff's doctor's requests for surgery and physical therapy." (*Id*. ¶ 33.)[4]

On September 18, 2020, Plaintiff was offered a light duty assignment in the Special Services-Training division of the McHenry County Sheriff's Office.  (*Id*. ¶ 35.)  Plaintiff alleges that this assignment was inconsistent with doctor's determination that she was "unable to work," but Defendant (she does not say who, specifically) nonetheless threatened to terminate her employment if she refused to work.  (*Id*.)  Plaintiff was further instructed (again, she does not say by whom) that her light duty assignment would require her to work "8.5 hours on an administrative schedule"—a schedule that violated the union contract and had never been imposed an anyone else in her unit during Plaintiff's 16-year tenure.   (*Id*. ¶¶ 36, 40).  When Plaintiff complained about the schedule, Defendant's business manager, Sandra Salgado, told her to "deal with it or not come back to work."  (*Id*. ¶ 41.)

On October 23, 2020, after speaking with other female deputies about their experience dealing with human resources staff, Plaintiff determined that "males all get the necessary medical help" and male officers "do not have to ever go as far as females do to prove their claims and injuries" (she offers no specific examples).  (*Id*. ¶ 46.)  Plaintiff had evidently sought arbitration of a claim for workers' compensation benefits and won an award in her favor on November 10, 2020.

---

[4]      Again, the court is uncertain how an employer could prohibit Plaintiff's doctor from taking any necessary action and infers that she means that Defendant declined to reimburse the doctor for these services.  *See supra* n. 2.

(*Id*. ¶ 49.) [5]    The arbitrator also concluded that Plaintiff should be "completely restricted from working pending ability to proceed with the proposed surgery." (*Id*.)    Defendant immediately appealed the arbitral award, and Plaintiff "was once again denied for the surgery at this point." (*Id*. ¶ 51.)    She had a physical therapy appointment on November 23, 2020, but "[a]gain, Defendant ordered a stoppage of the physical therapy." (*Id*. ¶ 51.)[6]

In February 2021, Plaintiff began to investigate whether any other officers in her position were working 8.5-hour shifts.    Two male officers with whom she spoke—Officer Hermann and Officer Carlson—were, like Plaintiff, assigned to an "admin schedule" but had eight-hour shifts. (*Id*. ¶ 56.)  She learned that other workers in "administrative schedule" positions also only worked eight-hour shifts.  (*Id*. ¶ 5.)  On February 17, 2021, Plaintiff filed an EEOC charge and initiated a union grievance challenging the 8.5-hour shift. (*Id*. ¶¶ 60-64).   Neither party has provided an update on this proceeding.

Ten days after filing her EEOC Charge against Defendant, Plaintiff was transferred from the 8.5-hour Special Services shift back to a position in Corrections that required her to "sort papers, remove staples from transport logs and scan the transport logs into the OnBase computer system." (*Id*. ¶¶ 66-68, 75.)  Lieutenant Acevedo, who advised her of the transfer, acknowledged that he was "not sure the job in the jail will be able to accommodate Plaintiff like the Special Services position did." (*Id*. ¶ 70-72.)  In fact, in the new Corrections position, Plaintiff was not provided with private space where she could lift her shirt in order to use her "H-wave" pain relieving equipment; instead, she only had access to an unlocked conference room with an "occupied" sign. (*Id*. ¶¶ 70, 80-81.)  Plaintiff alleges that her pain ranked "at a 9" (presumably out of 10) "all day" when she worked in the Corrections position.   (*Id*. ¶ 78.)  She took 50 milligrams

---

[5]      Plaintiff has not indicated when this arbitration began, nor are the records from the arbitration located in the record.

[6]      *See supra* n. 2.

of Tramadol to manage her pain when it was particularly severe (*id.* ¶ 83), but when supervisors learned about this, they told her that "[she] can't take Tramadol while working" and sent her home on sick leave. (*Id.* ¶ 85-86.)[7] Plaintiff asked to return to her prior position at Special Services, but was informed (she does not say by whom) that her prior position was "filled and no longer available" to her. (*Id.* ¶ 89.) But the position was not actually filled until April 26, 2021, she alleges, nearly a month after her inquiry, and "[r]andom people were subbing in" to Special Services in the meantime. (*See id.* ¶¶ 89, 94, 101.)

Defendant ultimately withdrew its appeal of the worker's compensation arbitration decision that concluded Plaintiff was entitled to microdissection surgery (*id.* ¶ 117), and she underwent surgery on September 8, 2021. (*Id.* ¶ 118.) She suffered a setback, however, after a fall at home on January 23, 2022, and then during her "first day of work conditioning" (March 4, 2022), she was unable to continue due to pain. (*See id.* ¶ 122-25.) Plaintiff was ultimately evaluated again by an independent physician who concluded that she needed further surgery, a fusion; Defendant did not contest this determination. (*See id.* ¶¶ 142-46.) But this surgery also failed (*id.* ¶ 151), and as of the most recent IME, Plaintiff requires yet another operation. (*Id.* ¶ 159.) It appears from the Amended Complaint that Plaintiff has been on leave from active duty since March 16, 2021. (*See id.* ¶¶ 92-93.)

Plaintiff alleges that Defendant's refusal to approve surgery before September 8, 2021 has had a significant impact on Plaintiff's earnings and benefits. The Illinois Public Employee Disability Act ("PEDA") provides for 365 days of full wages and benefits for injuries sustained while working at a correctional facility. (*See id.* ¶ 165; *see also* 5 ILCS 345/1.) Because of Defendant's delays, however, Plaintiff ran out of days under PEDA, and was placed on Total Temporary Disability ("TTD"); in that status, she recovers just two-thirds of her wages, and does

---

[7] Plaintiff alleges that she had been "previously approved" to take Tramadol at work (Am. Compl. ¶ 86), but does not say by whom; nor does she explain whether she took it for the first time at work in March 2021, or had been able to do so while working in Special Services.

not accrue pension benefits, make contributions to retirement accounts, or receive raises authorized by union contract. (*See id*. ¶¶ 165, 166D-G.)

In addition to the troublesome delays, Plaintiff alleges that Defendant's employees repeatedly expressed doubts about her inability to work and the severity of her injury. (*See, e.g.*, *id*. ¶¶ 4, 48, 120, 139.) Additionally, during the period in May 2023 when she sought additional surgery, Plaintiff claims that her home was surveilled by "an investigator for the worker's compensation insurance," causing further harm and discomfort to her family. (*See id*. ¶ 155-57.)

On September 14, 2023, the EEOC issued a right-to-sue letter (*id*. at 7), and this lawsuit followed, alleging violations of the ADA and Title VII. (*See* Compl. [1], 3-4.) Proceeding *pro se*, Plaintiff has amended her complaint, and Defendant now moves to dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim. (Def.'s Mot. to Dismiss [18].) Specifically, Defendant argues that Plaintiff has not alleged an adverse employment action under Title VII or the ADA, is not qualified to perform the essential functions of her job as required for her ADA claims, and has not alleged an adverse employment action for purposes either of her ADA claim or her retaliation claims. (*See generally* Def.'s Mem. [19], 2-5.) While Defendant's motion was pending, the Supreme Court of the United States decided *Muldrow v. City of St. Louis*, effectively lowering the bar for proof of an adverse employment action under Title VII. *See* 601 U.S. 346, 353-55 (2024). At the court's request ( [24]), the parties submitted supplemental briefs to address the impact of *Muldow*. (Def.'s *Muldrow* Resp. [27]; Pl.'s *Muldrow* Resp. [30]).[8]

---

[8]      Plaintiff's brief includes purported quotations without citations or citations that do not include the quoted material. (*See* Def.'s Reply [4], 4). For example, she cites *Stone v. Autolive ASP, Inc.* as stating that "comments directed specifically at the Plaintiff, are direct evidence of sex based discrimination. Such comments can give rise an inference of discrimination." (Pl.'s Opp'n at 3.) *Stone* does not contain this language, and its conclusion was more nuanced. *See* 210 F.3d 1132, 1140 (10th Cir. 2000) ("Age-related comments referring directly to the plaintiff can support an inference of age discrimination, but 'isolated [or] ambiguous comments' may be, as here, too abstract to support such an inference.") As Plaintiff is proceeding *pro se*, the court reads her submissions generously, but warns against inaccurate citations or quotes.

**LEGAL STANDARD**

A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Under this standard, "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.' " *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint "by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015). To survive such a motion, a complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Applying this standard, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016). "Conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681). Additionally, as Plaintiff has appeared *pro se* in this matter, the court will construe the complaint liberally and hold it to a "less stringent standard than pleadings drafted by lawyers." *Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017).

**DISCUSSION**

Plaintiff's Amended Complaint provides a largely chronological account of her concerns but does not organize the allegations into distinct claims. As best the court understands her submissions, she contends that Defendant (1) discriminated against her based on sex in denying her original request for surgery and "subject[ing] [her] to the full scope of the Worker Comp system," (*see* Am. Compl. ¶ 166), in violation of Title VII; (2) subjected her to a hostile work

8

environment by "ignor[ing] or ma[king] fun of" her complaint concerning her treatment and that of other female officers  (*see* Pl.'s Opp'n [22], 5); (3) "forced [her] back to work" on September 18, 2020 in retaliation for her participation in an arbitration hearing on September 14th, 2020, in violation of ADA (*see id.* at 4); (4) reassigned her from Special Services to Corrections in retaliation for her filing of an EEOC complaint ten days earlier, in violation of Title VII and the ADA (*see id.* at 5-6, Am. Compl. ¶ 169); and (5) placed a video camera across from her home, aimed at the bedroom window of her minor child, in retaliation for her requests for surgery, also in violation of the ADA (*see* Pl.'s Opp'n at 6).[9]

## I.    Discrimination Claim under Title VII

At the 12(b)(6) stage, a plaintiff alleging sex discrimination under Title VII "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)).   For purposes of Title VII, an adverse employment action is one that affects the "compensation, terms, conditions, or privileges of employment . . . such as hiring, firing, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits."  *Gibbs v. Gen. Motors Corp.*, 104 Fed. Appx. 580, 583 (7th Cir. 2004) (citing *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000).   "Actions that deprive the employee of compensation which he otherwise would have earned constitute adverse employment actions for the purposes of Title VII."  *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008)

---

[9]            In section B of its memorandum in support of the motion to dismiss, Defendant appears to read Plaintiff's Amended Complaint as alleging discrimination under Title I of the ADA and argues that Plaintiff has failed to establish she was qualified to perform essential functions of the job.  (*See* Def.'s Mem. at 3-5.)  The court does not read Plaintiff's Amended Complaint and pleadings as asserting an ADA discrimination claim, however.   Plaintiff contends that she was "unable to work" (*i.e.* not qualified) when Defendant required her to return to light duty.  (*See* Am. Compl. ¶ 35.)  Moreover, in replying to Defendant's argument in section B, Plaintiff makes no reference to any discrimination claim under the ADA and focuses instead on a claim of retaliation. (*See* Pl.'s Opp'n at 4.)  The court agrees that Plaintiff has not alleged that she was qualified to perform the essential functions of her job following her injury, with or without accommodation.

(*Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007). Recently, in *Muldrow v. St. Louis*, involving a discriminatory transfer claim, the Supreme Court clarified that to establish employment discrimination under Title VII, a plaintiff need not prove that she suffered a material or significant harm from the employment action, only that she suffered "some harm respecting an identifiable term or condition of employment." 601 U.S. at 347. Even under this relaxed standard, Defendant here argues that Plaintiff has not alleged an adverse employment action against her.

With respect to her Title VII discrimination claim, Plaintiff claims that Defendant's denial of her original injury claim and opposition during the workers' compensation process, resulting in the delay of Plaintiff's surgery, expiration of PEDA coverage, and diminution of her wage and benefits, constitute adverse employment actions. (*See* Am. Compl. ¶ 166.) Significantly, Plaintiff is not contesting the workers' compensation process itself (*see* Pl.'s Opp'n at 2), alleging Defendants took any steps to wrongfully delay the workers' compensation process, or suggesting that Defendants somehow deprived her of her full PEDA rights. Rather, Plaintiff claims that Defendant approved medical treatments for men under similar circumstances, and that by contesting her request for surgery (or as the court understands this, refusing to reimburse the expense of surgery), Defendant caused Plaintiff to use her PEDA benefits earlier than she should have.

As noted above, an adverse employment decision under the meaning of Title VII can include "an action that causes a substantial change in benefits." *Gibbs*, 104 Fed. Appx. at 583. Plaintiff has alleged such an action here, one that resulted in a substantial change in her employment benefits, including a one-third reduction in her pay and a complete loss of her ability to accrue retirement benefits and raises. (*Cf. Campbell v. New York City Transit Auth.*, 93 F. Supp. 3d 148, 170 (E.D.N.Y. 2015), *aff'd*, 662 Fed. Appx. 57 (2d Cir. 2016) ("Plaintiff also concedes that she was paid workers' compensation benefits in full, thus the decision to controvert her workers' compensation claim did not constitute adverse action as it did not result in a material loss of benefits.") She has claimed that these losses were caused by Defendant's actions in denying and delaying her surgery for injuries occurring in the course of her employment. While

denying a surgery may not be the prototypical "employment action," such as a firing, reassignment, or demotion, it was nonetheless an action that was taken in the context of Plaintiff's employment with Defendant and substantially, if indirectly, impacted the terms of Plaintiff's employment benefits.

Defendant asserts in its supplemental briefing that the act of denying or delaying the surgery caused harm to Plaintiff only if she can show that getting surgery at an earlier date would have resolved her pain, enabling her to return to active duty with full wages and benefits within 365 days. (Def.'s *Muldrow* Resp. at 2.) Without such a showing, Defendant urges, it was inevitable that Plaintiff would have exhausted her PEDA benefits, and the delay would not have caused any loss of her compensation or promotion opportunities. Plaintiff meets this concern, however, by alleging that early on in her appointments with County-appointed doctors, she "was also told without surgery that after one year of being injured, the chances of the injury becoming permanent increases." (Am. Compl. ¶ 7.) Reading this allegation liberally, the court can reasonably infer that because the surgery eventually occurred more than a year after the initial injury, Defendant's delay increased the risk that the surgery would be unsuccessful and the injury would be permanent. Expert testimony would be necessary to prove this claim, and doing so could be difficult; but whether she can do so is a question for summary judgment, not 12(b)(6). Plaintiff's discrimination claim under Title VII survives this motion.

## II. Hostile Work Environment Claim under Title VII

Plaintiff claims that Defendant created a hostile work environment by creating "a fear of termination," and by ignoring or making fun of her multiple complaints regarding her treatment and the treatment of other female officers. (*See* Pl.'s Opp'n at 5; *see also* Am. Compl. ¶ 173.) To state a claim for a hostile work environment under Title VII, a plaintiff must allege "(1) she was subject to unwelcome harassment; (2) the harassment was based on [her membership in a protected class under Title VII]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is

basis for employer liability." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty*., 804 F.3d 826, 834 (7th Cir. 2015). "[B]oorish or offensive stray remarks" are generally "neither severe or pervasive enough to create an objectively hostile work environment." *Mercer v. Cook Cnty*., 527 F. App'x 515, 521 (7th Cir. 2013) (quoting *Racicot v. Wal–Mart Stores, Inc*., 414 F.3d 675, 678 (7th Cir.2005)).

From what appears in the Amended Complaint, the bases for Plaintiff's hostile work environment claim are a comment made by her supervisor, Sergeant Guzman, that her injury was due to "crazy sex shit" with her husband, and the repeated failures of her superiors to address her complaints about pain. (*See* Am. Compl. ¶¶ 4, 173.) However unpleasant these circumstances were, the court is unable to find the alleged conduct "so severe and pervasive that a reasonable person would find the work environment abusive or hostile." *Salvadori v. Franklin Sch. Dist*., 293 F.3d 989, 997 (7th Cir. 2002). Sergeant Guzman's comment, while certainly offensive and inappropriate, appears to be a single "stray remark," not accompanied by continued or similar harassment from other employees. That other supervisors allegedly ignored this harassing comment is also troubling, but does not, without more, render Plaintiff's work environment abusive or hostile. *See id.* (rejecting Plaintiff's argument that "School District subjected her to a racially hostile work environment by ignoring her complaints that students were harassing her" through isolated offensive comments). Should Plaintiff seek to pursue this claim under Title VII, she must include more facts about conduct or comments by Defendants or their employees constituting "severe or pervasive" harassment that can plausibly be found to be objectively hostile. *See Huri*, 804 F.3d at 834. She may also make allegations supporting an inference that comments from supervisors belittling her complaints of pain were severe or pervasive and were based on sex. For now, because Plaintiff's current allegations fall short of this standard, Plaintiff's hostile work environment claim is dismissed without prejudice.

### III.    Retaliation Claims

Plaintiff brings retaliation claims under both the ADA and Title VII, and the pleading standard for each is similar.  *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) ("[T]he anti-retaliation provision of the ADA . . . uses similar language to that in Title VII . . . thus, courts look to Title VII retaliation cases for guidance in deciding retaliation cases under the ADA."). To state a claim for retaliation under either the ADA or Title VII, a plaintiff must allege (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two.  *See Summerland v. Exelon Generation Co.,* 455 F. Supp. 3d 646, 662 (N.D. Ill. 2020) (citing *Guzman v. Brown Cnty.,* 884 F.3d 633, 642 (7th Cir. 2018) (stating pleading standard for ADA retaliation claim); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (stating standard for Title VII retaliation claim).  "Statutorily protected activity" under Title VII involves "some step in opposition to a form of discrimination that the statute prohibits."  *O'Leary v. Accretive Health, Inc*., 657 F.3d 625, 631 (7th Cir. 2011).  "To have engaged in an activity protected by the ADA," for retaliation purposes, "the employee 'must have asserted [her] rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to [her] disability.'"  *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 856 n. 6 (7th Cir. 2023) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814-15 (7th Cir. 2015)). Defendant urges that these claims fail because Plaintiff has not identified an adverse employment action.  (*See* Def.'s Mem. at 5-6.)  That issue aside, in the court's view some of the alleged retaliation is not actionable because Plaintiff has not that she engaged in statutorily protected activity prior to the allegedly retaliatory act.

First, Plaintiff claims that she was retaliated against in violation of the ADA by being forced to return to work shortly after appearing in a hearing related to her worker's compensation arbitration.  (*See* Pl.'s Opp'n at 4.)  However, merely appearing at a worker's compensation arbitration hearing does not constitute seeking an accommodation or raising a discrimination claim under the protection of the ADA.  *See Emerson v. Dart*, No. 21 C 06407, 2023 WL 143223,

*2 (N.D.Ill. Jan. 10, 2023) ("[T]his Court does not see how [plaintiff's] workers' compensation claim constituted a request for accommodation or other statutorily protected activity like filing formal charges [or] voicing informal complaints to superiors.") (quotations omitted); *Strong v. Quest Diagnostics Clinical Lab'ys, Inc.*, No. 19 C 4519, 2021 WL 354000 *7 (N.D. Ill. Feb. 2, 2021) (finding that Plaintiff alleging retaliatory termination from bringing worker's compensation claim "has not offered any facts demonstrating that she engaged in an ADA-protected activity").[10]

Plaintiff also alleges retaliation in violation of the ADA on the basis that, shortly after she attended an IME seeking further treatment, a video camera was placed across from her home, pointed at her minor child's window. (*See* Pl.'s Opp'n at 6.) This claim is puzzling for a number of reasons, including that Plaintiff has not alleged that Defendant was involved at all; she alleges instead that the surveillance was conducted by "an investigator for the workers' compensation insurance." (Am. Compl. ¶ 157.) Regardless, this claim must be dismissed for the much simpler reason that attending an IME is not a protected activity under the ADA, as it involves no demand for accommodation nor claim of discrimination. *Cf. Casna*, 574 F.3d at 427 ("[S]tatutorily protected activity [under the ADA] can range from filing formal charges to voicing informal complaints to superiors.")

That leaves Plaintiff's retaliation claims arising from her transfer from Special Services to Corrections shortly after filing her EEOC complaint. (*See* Pl.'s Opp'n at 5-6.) These claims do not fail for failure to allege statutorily protected activity, as filing an EEOC complaint is "the most obvious form of statutorily protected activity." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 740 (7th Cir. 2011), *overruled on other*

---

[10] Plaintiff may be able to allege retaliation for her participation in the workers' compensation process, in violation of Illinois law. *see Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016) (recognizing common-law cause of action for retaliatory discharge under Illinois Workers' Compensation Act). The court notes that being required to return to work would not constitute retaliation unless workers in similar circumstances, who had not filed a workers' compensation claim, were not expected to return to work. In any case, Plaintiff has brought this claim under the ADA, not under Illinois law.

grounds *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)); *see also Silk v. Bd. of Trustees*, 795 F.3d 698, 710 (7th Cir. 2015) (recognizing EEOC complaint satisfies statutorily-protected activity element under ADA).  Just ten days after filing an EEOC complaint alleging discrimination under Title VII and the ADA, (*see* Am. Compl. ¶ 102 (listing claims made in EEOC complaint)),[11] she was transferred from her 8.5-hour shift in Special Services to an 8-hour shift in Corrections.  (Am. Compl. ¶ 66-67.)  Plaintiff has not identified the individual[s] who  assigned her to return to her position in Corrections, nor has she alleged that they were aware of the filing of the EEOC charge, but reading the complaint in a light favorable to Plaintiff, the court will assume she can make this showing.  The greater hurdle for Plaintiff is establishing that transferring her to Corrections constitutes adverse employment action.

For both retaliation claims under the ADA and Title VII, an adverse employment is an action that "would have dissuaded a reasonable worker from engaging in protected activities like filing a charge with the EEOC, requesting a reasonable accommodation, or otherwise opposing disability discrimination."  *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 766 (N.D. Ill. 2020) (also explaining that the standard for ADA retaliation is borrowed from Title VII retaliation).  "The challenged action must be one that a reasonable employee would find to be materially adverse . . . ."  *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, (7th Cir. 2007).  An employment action is "materially" adverse when it threatens "significant" harm rather than "trivial harms" or

---

[11]     Though Plaintiff has not referred in her briefs to a substantive ADA claim, the Amended Complaint suggests that her EEOC charge did refer to "failure to accommodate" and "disability discrimination."  (*See* Am. Compl. ¶ 102.)  As previously noted, Plaintiff has insisted that she was unable to perform any work for Defendant after her injury.  She has not identified any accommodation that would have changed things, effectively dooming any discrimination or failure to accommodate claim under the ADA.  *See supra* p. 9 n. 7.  True, "a plaintiff may pursue a retaliation claim 'regardless of whether the initial claims of discrimination are meritless.'" *Rowlands v. United Parcel Serv.*, 901 F.3d 792 (7th Cir. 2018) (quoting *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).  That said, it is not clear to the court that Plaintiff had an "objectively reasonable" belief that Defendant violated the ADA when she herself believes she was unable to carry out the responsibilities of any job to which she was assigned.  *Cf. Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000) ("If a plaintiff opposed conduct that was not proscribed by Title VII . . . his sincere belief that he opposed an unlawful practice cannot be reasonable.")

"petty slights or minor annoyances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).[12]

Plaintiff's claim that her transfer from Special Services to Corrections was an act of retaliation fails because she has not alleged any basis for concluding that the transfer harmed her. As Plaintiff herself alleges, she had objected to being assigned to the Special Services position in the first place and was forced to accept the assignment by a threat of termination. (*See* Am. Compl. ¶ 35.) The only position she had held prior to the Special Services assignment was that of a Correctional officer, and she asserts that she both "lost her esteemed positions within the jail" and "was missing out on vital interactions with her fellow Officers and her Correctional first line Supervisors" when assigned to Special Services. (Pl.'s *Muldrow* Resp. at 3.) Once at Special Services, prior to filing her EEOC complaint, Plaintiff repeatedly complained to her superiors about the 8.5-hour administrative shift in the Special Services division. (*See* Am. Compl. ¶¶ 40, 47.)

Plaintiff's return to the Corrections assignment would appear to have addressed many of these concerns. Immediately upon returning to Corrections, Plaintiff was placed on an eight-hour work schedule, as requested. (*See id*. ¶ 67.) Additionally, by returning to Corrections, she was presumably no longer missing out on "vital interactions" with her fellow Correctional officers and supervisors. While Plaintiff claims that her work in Corrections "was with in [sic] her Union working hours, but yet outside of the working conditions put forth by the Union" (Pl.'s *Muldrow* Resp. at 3), Plaintiff does not explain how the work in Corrections violated Union standards, or how it was more challenging or pain-inducing than her secretarial work in Special Services. All that she has alleged on this score is that her assignment in Corrections after the transfer was to "sort papers, remove staples from transport logs and scan the transport logs into the OnBase computer

---

[12]     The Supreme Court's decision in *Muldrow* eliminated the materiality requirement in alleging discrimination under Title VII, but left standing the materiality element of Title VII (and thus ADA) retaliation claims. *See Muldrow*, 601 U.S. at 357.

system." (Am. Compl. ¶ 75.) While Plaintiff alleges that, upon her transfer, Lieutenant Acevedo stated that "he is not sure the job in the jail will be able to accommodate Plaintiff" (*id*. ¶ 72), this statement alone—without context of Lieutenant Acevedo's role in the transfer or facts explaining the accommodations Plaintiff had in Special Services—does not make the transfer adverse or show that the Defendant intended the transfer as retaliation.[13] Plaintiff has not alleged that returning her to a Corrections position placed her in a materially worse position than Special Services, and her allegations suggest that the transfer was in fact an attempt at accommodation rather than retaliation. Should Plaintiff seek to amend her Complaint to these claims, she must provide a "short and plain statement" of facts, consistent with Rule 8(a), identifying the decisionmakers responsible for her transfer to Corrections, explaining how the reassignment to Corrections was more painful or physically demanding than the assignment to Special Services, and demonstrating that Defendant's decisionmakers were aware of and intended these increased physical demands.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. Plaintiff's Title VII discrimination claim survives this ruling. Plaintiff's hostile work environment claim and retaliation claims are dismissed without prejudice. Plaintiff has leave to file an amended complaint within 21 days. Should she choose to stand on the existing complaint, Defendant is directed to file its answer to the Title VII discrimination allegations no later than November 21, 2024.

ENTER:

Dated: October 4, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

---

[13] In this regard, the court notes that Plaintiff steadfastly insists that her doctors have told her she was incapable of working at all. The ADA does not require an employer to provide a worker with indefinite leave from employment she is unable ever to perform. *See Severson v. Heartland Woodcraft, Inc*., 872 F.3d 476, 481-82 (7th Cir. 2017).